1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

CHERRY DIETZMANN, individually;
MINOR J.A. II, by and through his mother
and guardian, CHERRY DIETZMANN;
and MINOR D.A. by and through her
mother and guardian, CHERRY
DIETZMANN,

               Plaintiffs,

    vs.

CITY OF HOMER, the HOMER POLICE
DEPARTMENT; HOMER CHIEF OF
POLICE MARK ROBL, individually and
as an agent or employee of the Homer
Police Department; SERGEANT
LAWRENCE KUHNS, individually and as
an agent or employee of the Homer Police
Department; SERGEANT WILLIAM
HUTT, individually and as an agent or
employee of the Homer Police
Department; SERGEANT DAVID
SHEALY, individually and as an agent or
employee of the Homer Police
Department; OFFICER STACY LUCK,
individually and as an agent or employee
of the Homer Police Department; UNITED
STATES OF AMERICA; UNITED
STATES MARSHAL'S SERVICE;
KEVIN GUINN, in his official capacity as
a United States Deputy Marshal, and in his
individual capacity; and JOHN OLSON,
JR., in his official capacity as a United
States Deputy Marshal, and in his
individual capacity,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 3:09-cv-00019-RJB

**ORDER ON THE PARTIES'
MOTIONS FOR SUMMARY
JUDGMENT AND VARIOUS OTHER
MOTIONS**

28

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 1

This matter comes before the Court on:

1) Plaintiffs' Motion for Partial Summary Judgment (Dkt. 101),

2) Defendants United States, United States Marshal's Service, Deputy U.S. Marshal Kevin Guinn and Deputy U.S. Marshal John Olson's ("Federal Defendants") Cross Motion for Partial Summary Judgment That There Was No Fourth Amendment Seizure of Plaintiffs J.A. II and D.A. (Dkt. 118, redocketed as Dkt. 126),

3) Federal Defendants' Motion for Partial Summary Judgment on Plaintiffs' *Bivens*' Claims For Alleged Violations of Fourth Amendment Rights (Dkt. 158),

4) Defendants City of Homer, Homer Police Department, Homer Chief of Police Mark Robl, Sergeant Lawrence Kuhns, Sergeant William Hutt, Sergeant David Shealy, and Officer Stacy Luck's Cross Motion for Partial Summary Judgment on Fourth Amendment Claims ("City of Homer") (Dkt. 106, redocketed as Dkts. 107, 129, and 130),

5) Federal Defendants' Motion to Dismiss Cherry Dietzmann's *Bivens* Claims Against Deputy Marshals Kevin Guinn and John Olson, Jr. as Barred by Statute of Limitations, (Dkt. 146),

6) Defendants John Olson, Jr., and Kevin Guinn's Motion for Summary Judgment on Plaintiffs' *Bivens* Claims for Alleged Violation of Fifth Amendment Rights (Dkt. 164),

7) City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159),

8) City of Homer's Motion for Summary Judgment on State Claims (Dkt. 153), and

9) United States' Motion for Dismissal, Judgment on the Pleadings or Summary Judgment with Respect to Plaintiffs' Federal Tort Claims Act Claims and Any Claims Asserted Against the U.S. Marshal's Service or Against Deputy Marshals Olson and Guinn in their Official Capacity (Dkt. 163).

The Court has considered the pleadings filed in favor and in opposition to the motions, the file herein, and heard oral argument on 15 November 2010.

## FACTS AND PROCEDURAL HISTORY

Plaintiffs bring this case alleging they sustained injuries during the attempted arrest of Jason Anderson which resulted in a shootout at the Homer, Alaska Airport. Dkt. 84. Plaintiffs are Cherry

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 2

Dietzmann, Anderson's girlfriend, and their two children, J.A.,age two at the time of these events, and D.A., age six months at the time ("children"). *Id.* Plaintiffs file claims against the Federal Defendants pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) and the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.* Dkt. 84. Plaintiffs make claims against the City of Homer Defendants pursuant to 42 U.S.C. § 1983 and Alaska state law. *Id.*

### A.    FACTS

In 2006, Defendant Deputy U.S. Marshals John Olson and Kevin Guinn were assigned to the Alaska Fugitive Task Force ("AFTF"), which was a combined federal and state effort to arrest federal and state fugitives wanted for crimes of violence and drug trafficking. Dkt. 126-1, at 1-5. A memorandum of understanding governs the AFTF. *Id.* None of the City of Homer officers were members of the AFTF at the time of the incident. Dkt. 132-3, at 6. Deputy Marshal Olson testified that he requested the Homer Police Department's help in apprehending Jason Anderson, Sr. in the early spring of 2006. Dkt. 190-1, at 2.

Deputy Marshal Olson states that he began his investigation of Jason Anderson on or around February 17, 2006, after receiving a "collateral lead" from the U.S. Marshal's office in Minnesota. Dkt. 102, at 20. Deputy Marshal Olson testified that he was aware that there was a federal warrant (for drugs) and a state warrant (for assault) out on Anderson. Dkt. 102, at 13. He states that he had a lead that Anderson was living in the area of Soldotna, Alaska, but eventually came to believe that Anderson was in Homer, Alaska. Dkt. 102, at 20. Deputy Marshal Guinn testified that they made several efforts to find in Anderson, in several towns, over a long period of time. Dkt. 126-8, at 13. Deputy Marshals Olson and Guinn were aware that Anderson was living with Plaintiff Cherry Dietzmann and their two children. Dkt. 102, at 20. The deputy marshals had a U.S. Marshal's "Subject Report" on Anderson which indicated that Anderson had convictions for armed kidnaping, assault, and domestic abuse. Dkt. 126-3, at 1-4. The "Subject Report" stated that Anderson was armed and dangerous. Dkt. 126-3, at 1-4.

On or about the 21st of February 2006, Deputy Marshals Olson and Guinn briefed the City of Homer Police Department about Anderson. Dkts. 102, at 6 and 20, and 126-8, at 12-13. Alaska State

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 3

Troopers were also at the meeting. Dkt. 134-2, at 2. The deputy marshals reported that Anderson was on their top ten or twelve most wanted list. Dkt. 134-2, at 2. City of Homer Sergeant Larry Kuhns states that they were told that Anderson was armed and dangerous, had warrants out for his arrest, and about Anderson's prior convictions. Dkt. 126-11, at 5. Sergeant Kuhns states that they were also told that Anderson was reputed to be a "gang enforcer." Dkt. 132-3, at 5. Sergeant Kuhns testified that they were told that Anderson had threatened to "shoot it out" with police if they tried to apprehend him. Dkt. 132-3, at 5. Alaska State Trooper Tom Dunn testified that he was at this meeting, and expressed concerns about not attempting the arrest until they could separate Anderson from his children, his gun, and the dogs. Dkt. 134-2, at 6-7.

The next day, Sergeant Larry Kuhns sent an email to the other Homer officers regarding Anderson. Dkt. 126-4, at 1. Sergeant Kuhns recounted what the deputy marshals had told the people at the meeting the day before, including that Anderson was armed and dangerous. Dkt. 126-4, at 1. Sergeant Kuhns advised that Anderson may be accompanied by Ms. Dietzmann, their two children, and dogs. Dkt. 126-4, at 1.

Deputy Marshal Olson states that he, Deputy Marshal Guinn, and an Alaska State Trooper had to leave the Homer area in the middle of the week and go back to Anchorage. Dkt. 126-9, at 23.

Plaintiff Cherry Dietzmann, who met Anderson in 2003 when she was 16 years old, testified that she had run away from Anderson on a few occasions because he abused her. Dkt. 126-7, at 2. She testified that he'd broken several of her bones, burned her, and repeatedly injured her in other ways. Dkts. 132-5, at 6-7; 132-6, at 1-5. She states that he took her identification so that she could not leave the state of Alaska. Dkt. 132-5, at 2. She gave birth to J.A. in early 2004, and to D.A. in late 2005. Dkt. 132-4, at 5. In late February 2006, she stated she had again escaped Anderson and did not take the children. Dkt. 126-7, at 2. She states that she waited until he was occupied and she ran to the garage and took the car. Dkt. 126-7, at 2. Ms. Dietzmann states that she was in contact with him by phone and told him to turn himself in to authorities because she knew that there was a warrant out for his arrest. Dkt. 126-7, at 3. She told him that she wanted her children. *Id.* She states that he made various threats,

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 4

but that she "did not honestly believe he'd kill the kids." Dkt. 126-7, at 3. She testified that he was using marijuana everyday in 2006 and learned later that he was also taking methamphetamine ("meth"). Dkt. 132-4, at 7.

Both deputy marshals interviewed Cherry Dietzman on the 28th of February 2006. Dkts. 102, at 20 and 126-8, at 8. Ms. Dietzmann told them that Anderson had beaten her, and that Anderson had threatened her with a gun. Dkts. 102, at 13 and 126-8, at 8-10. Deputy Marshal Olson testified that Ms. Dietzmann told them she'd escaped from Anderson more than once. Dkt. 102, at 13. Deputy Marshal Guinn stated that Ms. Dietzmann told them the last time she had seen Anderson was a few days ago. Dkt. 126-8, at 18. She told them that Anderson held a gun to her head and cocked the hammer. Dkt. 126-8, at 18. Deputy Marshal Guinn testified that Ms. Dietzmann told them that Anderson told her that he would not let her go and that he would kill her and the children before he would let them go. Dkt. 126-8, at 10. Deputy Marshal Guinn testified that Ms. Dietzmann told them that Anderson said that if they tried to arrest him, he would shoot as many police as he could. Dkt. 126-8, at 17. Ms. Dietzmann states that she told the deputy marshals that "I've been trying for days now to try to get him away from them [sic] kids. He will not leave them [sic] kids. He will not leave them with anybody." Dkt. 126-7, at 5. Deputy Marshal Guinn acknowledged that Ms. Dietzmann told them that Anderson was never away from his children, dog, or guns. Dkt. 158-8, at 7. Both deputy marshals testified that Ms. Dietzmann told them that she was afraid that if an attempt to arrest Anderson was made in front of the children, the children would be injured. Dkts. 102, at 13 and 126-8, at 12. The deputy marshals stated that they told Ms. Dietzmann that they were going to make their best effort to return the children to her safely. Dkt. 126-8, at 12.

After talking with Ms. Dietzmann, the deputy marshals held another briefing with the Homer Police Department the evening of February 28, 2006, to discuss possible methods to arrest Anderson. Dkt. 126-8, at 15. Deputy Marshal Guinn states that they updated the Homer police officers that were there - Sergeant Kuhns, Sergeant Hutt, and Officer Luck - on the new information they had gathered. Dkts. 126-8, at 15 and 18-20. Alaska State Trooper, Tom Dunn, was at the meeting. Dkt. 126-8, at 20.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 5

Deputy Marshal Guinn testified that they told the Homer police that Anderson was armed and dangerous. Dkt. 126-8, at 20. Deputy Marshal Guinn testified that they reported what they learned from Ms. Dietzmann, including that Anderson had threatened to shoot the police and to kill his children if an attempt was made to arrest him. Dkt. 126-8, at 20. Sergeant Kuhns acknowledges that they relayed this information to everyone. Dkt. 126-11, at 6. Trooper Dunn testified he again expressed concerns about separating Anderson from the kids, and trying to effect an arrest when Anderson was not in a vehicle. Dkt. 134-2, at 6. Trooper Dunn called his supervisor during the meeting, and then returned and informed the officers assembled there that the Alaska State Troopers were unwilling to participate in a plan that did not involve separating Anderson from the children. *Id.*

The morning of March 1, 2006, the deputy marshals discovered that Anderson was driving an SUV which had been rented at the Homer airport. Dkt. 126-8, at 21. Deputy Marshals Olson and Guinn went to the Homer airport and approached Ty Gifford, the owner of the rental car company. Dkt. 102, at 17. After being informed that there were warrants out for Anderson's arrest, Mr. Gifford offered to ask Anderson to return to the airport and exchange his current SUV for another vehicle without a cracked windshield. Dkt. 126-8, at 23. Deputy Marshal Guinn testified that Mr. Gifford told them that last time Anderson came to trade vehicles, Anderson pulled up to the main terminal door, left the kids in the SUV, and came in and got the new keys. Dkts. 126-5at 6 and 126-8, at 25-26. Anderson then pulled over to the parking area, transferred the kids and the kids' car seats to the new vehicle, and lastly returned the keys to the old vehicle. Dkts. 126-5, at 6; and 126-8, at 25-26. At the deputy marshals' request, Mr. Gifford called Anderson and asked Anderson to come to the airport at 5:00 p.m. that day. Dkt. 126-8, at 23.

Early in the afternoon of the 1st, Ms. Dietzmann and Deputy Marshal Olson had about four conversations. Dkts. 126-8, at 23 and 126-9, at 26. The contents of these conversations are unclear from the record. *Id.*

The deputy marshals testified that they then contacted the Alaska State Patrol and the Homer Police Department and held another briefing to update everyone on the new information and plan to

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 6

apprehend Anderson. Dkts. 102, at 14 and 126-8, at 25. The Alaska State Troopers were not able to attend because they were too far away. Dkt. 190-1, at 3. The deputy marshals and Homer officers met at the Homer Police Station to discuss the plan to arrest Anderson. *Id.* The deputy marshals testified that they told the others that Deputy Marshal Olson would be outside the airport and warn of Anderson's approach. Dkts. 102, and 126-8, at 25-26. Deputy Marshal Guinn would be inside with the other officers and apprehend Anderson when he came to the rental car counter. Dkt. 126-8, at 26. Deputy Marshal Olson testified that he was in charge of the plan that night and gave directions to the other members of law enforcement. Dkt. 102, at 14. Deputy Marshal Olson testified that he and Deputy Marshal Guinn's initial plan was as follows:

> That [Anderson] would come in through the center doors, as he had done in the past, leave the children unattended in the vehicle and to go to the rental car company. He would go just around the corner just outside of sight from the main entry doors and that the officers there would apprehend him with what force was necessary; whether it was a tazer, whether it was by simply grabbing him.

Dkt. 102, at 14. Both deputy marshals testified that there was never any discussion of asking for a SWAT team or SERT team at any time. Dkts. 102, at 15 and 126-8, at 23. They did not have a contingency plan. Dkt. 126-8, at 27.

Late in the afternoon, Anderson called Mr. Gifford, and Anderson said he would be at the airport at 6:00 p.m. rather than 5:00 p.m. because he had to feed the children and get them ready. Dkt. 102, at 21.

After the briefing with the deputy marshals, Sergeant Kuhns called the City of Homer Chief of Police, Mark Robl, and told him of the plan to apprehend Anderson. Dkt. 173-9, at 7. Chief Robl states that he gave the Homer officers permission to participate in the plan. Dkt. 173-9, at 7. Chief Robl testified that he did not know that Anderson would likely have his children with him when the attempt was made to arrest him. Dkt. 190-2, at 4. Sergeant Kuhns also called Homer's emergency responders and told them that he and other members of law enforcement were going to the Homer Airport to attempt to arrest a "dangerous . . . criminal who's armed with a firearm." Dkt. 190-3, at 10.

A little after 5:00 p.m., Sergeant Kuhns drove an unmarked police car to the Homer Airport.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 7

Dkt. 190-1, at 4. Officer Luck and the other Homer officers drove Officer Luck's personal vehicle, a truck, to the airport. Dkt. 102, at 9. The deputy marshals followed in their vehicle. Dkt. 102, at 9. The deputy marshals were aware that a flight was due to arrive in the Homer airport around 6:30 p.m. that evening. Dkt. 126-5, at 6.

Deputy Marshal Olson stationed himself outside the airport. Dkt.102, at 15. Deputy Marshal Guinn was inside at the airport by the car rental counter with Mr. Gifford, Sergeant Kuhns, and Officer Luck. Dkts. 102, at 15; 126-8, 29; 132-2, at 2. Sergeants Hutt and Shealy were stationed inside the airport near the doors. Dkt. 190-3, at 4. Deputy Marshals Olson and Guinn were on a continuous cell phone call with each other. Dkt. 102, at 15.

Deputy Marshal Olson observed Anderson drive up in the rental SUV, and Olson told Deputy Marshal Guinn that Anderson had arrived. Dkt. 102, at 15. Deputy Marshal Olson testified that Anderson did not get out of the SUV to exchange keys as they hoped. Dkt. 102, at 15. Mr. Gifford then told the deputy marshals that Anderson called and said that he was not coming in, and wanted the keys brought out to him. Dkt. 102, at 15. Deputy Marshal Olson testified that at that point he moved his car to the center of the parking lot in order to watch Anderson more closely. Dkt. 102, at 15. Deputy Marshal Olson states that he was using binoculars. Dkt. 102, at 16. Deputy Marshal Olson could make out a dog in the front seat and a child's car seat, but could not tell if there was a child in the seat. Dkt. 102, at 16. Deputy Marshal Olson told Deputy Marshal Guinn about the dog and car seat. Dkt. 102, at 16. Deputy Marshal Olson told Deputy Marshal Guinn to tell Mr. Gifford to tell Anderson that "he was busy with a customer at the counter and it would be five to ten minutes." Dkt. 102, at 16. Deputy Marshal Olson states Deputy Marshal Guinn told him that Gifford called Anderson back, relayed the message, and Anderson got agitated and raised his voice. Dkt. 102, at 16. Deputy Marshal Guinn testified that at that point, the terminal had started to fill up with high school students and their families. Dkt. 126-8, at 32.

At that moment, Deputy Marshal Olson decided that it was time to switch plans. Dkt. 107, at 17. Deputy Marshal Olson testified that although they had discussed he, Deputy Marshal Guinn, or Mr.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 8

Gifford approaching Anderson with keys, he and Deputy Marshal Guinn decided it was too dangerous "with the state of agitation [Anderson] was in." Dkt. 102, at 17. The deputy marshals agreed that Olson would approach the front of Anderson's vehicle and activate his lights to distract Anderson so the other law enforcement officers could come and arrest him from behind. Dkts. 102, at 17 and 126-8, at 36. Deputy Marshal Olson testified that he told Deputy Marshal Guinn to get the other officers to come around and help outside. Dkt. 102, at 18. Deputy Marshal Guinn states that he told Sergeant Hutt to get Officer Luck and Sergeant Shealy, and drive Officer Luck's truck in around behind Anderson's SUV and box in his vehicle. Dkt. 126-8, at 39. Sergeant Hutt, Officer Luck and Sergeant Shealy left the terminal and got into Officer Luck's truck, which was parked in the general parking area. Dkts. 102, at 9 and 135-5, at 7. Officer Luck estimated it was about a minute or two between the time he learned that the plan changed and when he got into the truck and began to drive toward Anderson's SUV. Dkt. 160-2, at 3. It took about thirty seconds to a minute for the Homer officers to arrive at Anderson's SUV. *Id.*

Meanwhile, Sergeant Kuhns testified that from his position inside the terminal, he saw Deputy Marshal Olson drive by the front of the terminal and then Deputy Marshal Guinn ran by yelling that it was "going to go down outside." Dkt. 132-2, at 5. Sergeant Kuhns states that he was not privy to any of the conversations between the marshals, but ran out of the terminal to help. Dkt. 132-5.

Deputy Marshal Olson states that he approached Anderson's SUV from the front and turned on his emergency lights when he was around six to ten feet away. Dkt. 102, at 18. About the same time, the Homer officers pulled up behind Anderson in Officer Luck's pickup truck. Dkt. 102, at 9 and 24.

Sergeant Shealy testified that he, Sergeant Hutt, and Officer Luck approached Anderson's SUV from behind on the right rear passenger side. Dkt. 102, at 23. He states that Sergeant Hutt was walking slightly ahead of him. Dkt. 102, at 24. Sergeant Shealy states that he saw Anderson with a gun "pointing in at the marshal" and heard someone yell "gun." Dkt. 102, at 24. Sergeant Shealy states that he then saw Anderson turn and "reach up over the passenger seat toward Sergeant Hutt and [himself]."

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 9

Dkt. 102, at 24. Sergeant Shealy testified that when he fired his first shot, he had a clear view of Anderson and his gun. Dkt. 102, at 23. He states that he thinks his first shot went in the rear passenger window. Dkt. 102, at 23. Sergeant Shealy testified that after the first rounds hit, it was difficult to see because the car windows had spider webbing. Dkt. 102, at 23. Sergeant Shealy states he fired two shots. Dkt. 102, at 23.

Sergeant Hutt states that as they approached from behind, he saw Anderson holding a gun while sitting in the front seat. Dkt. 126-12, at 4. Sergeant Hutt testified that he saw Anderson point the gun at Deputy Marshal Olson. Dkt. 126-12, at 5. Sergeant Hutt states that he saw Anderson move his arm toward the back and pointed the gun at him and the other Homer police officers. Dkt. 126-12, at 5. Sergeant Hutt testified that he did not know who shot first. Dkt. 102, at 27. Sergeant Hutt states that he fired at Anderson's head, which at the time, was crouched down between the front seat backs. Dkt. 102, at 27. Sergeant Hutt testified that he knew that the children might get injured if they tried to apprehend Anderson with the children present. Dkt. 102, at 29. Sergeant Hutt testified that the last shot was his as he shot the pit bull that Anderson had released on them. Dkt. 126-12, at 2. Officer Luck fired four or more shots. Dkt. 136-4, at 4.

Deputy Marshal Olson states that he could not get the car door to open immediately because the automatic lock was on and he had on his seatbelt. Dkt. 102, at 18. Deputy Marshal Olson states that at the time he began firing, Anderson's driver side door was open and the door's window was "spider web cracked," but still there. Dkt. 102, at 19. Deputy Marshal Olson states that his first shot cleared the window. Dkt. 102, at 19. Deputy Marshal Olson states that he fired up to six rounds in a couple of seconds. Dkt. 102, at 19. Deputy Marshal Olson states that he saw a child in the car before he began shooting. Dkt. 102, at 19. Anderson shot his gun four times. Dkt. 136-6, at 3.

Deputy Marshal Guinn and Sergeant Kuhns raced out of the terminal and heard gun fire begin at the arrest site. Dkt. 141-1, at 7. They arrived as the gun fire ended. Dkt. 141-1, at 7. Neither Deputy Marshal Guinn or Sergeant Kuhns fired a shot. Dkt. 132-3, at 2.

After the gun fire ended, Anderson was found kneeling in the driver's seat, slumped toward the

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 10

passenger's seat, with his right arm hanging in the footwell behind the driver's seat. Dkt. 141-1, at 8. Deputy Marshal Guinn got into Anderson's SUV and took the gun out of Anderson's hand. Dkt. 134-4, at 6. Deputy Marshal Olson handcuffed Anderson. Dkt. 126-9, at 29. Deputy Marshal Olson testified that the baby girl, D.A., did not appear to be harmed and was not crying. Dkt. 126-9, at 30. Both children were in their car seats. Dkt. 134-4, at 8. J.A., age two, had been shot in his face. Dkt. 126-14, at 2. Sergeant Kuhns testified that he thought he heard Sergeant Hutt exclaim that he thought he may have shot the child. Dkt. 132-3, at 2.

State of Alaska Deputy Medical Examiner, Stephen A. Erickson, M.D., opined Anderson's cause of death was a "self inflicted gunshot wound to the head following multiple gunshot wounds of head, trunk, and left arm," and that Anderson's manner of death was suicide. Dkt. 126-13, at 1.

Alaska's Chief Medical Examiner, Franc G. Fallico, M.D. opined that J.A. "[s]uffered a perforating gunshot wound of the head, with the entrance wound being on the left cheek and the bullet fired at tight contact range." Dkt. 158-14. Dr. Fallico opined that the exit wound was on the right parietal scalp. Dkt. 158-14. He noted that the emergency room doctors thought the reverse - that the entrance wound was on the right parietal scalp. *Id.* Both Dr. Fallico and Vincent J.M. Di Maio, M.D., opined that, based on the characteristics of the wounds, it was Anderson who shot J.A. Dkt. 158-14, at 4, and 158-15, at 2.

Both deputy marshals testified that they had information at the time of the incident that Mr. Anderson was armed and dangerous. Dkt. 102, at 12 and 126-8. Both had information that Anderson had threatened to "shoot it out with the police" if there was an attempt to apprehend him. Dkts. 102, at 12 and 126-8, at 8. Deputy Marshal Olson testified that he thought that there "was a high likelihood" that the children would be with Anderson when he came to the airport. Dkt. 102, at 12. Deputy Marshal Guinn testified that he assumed that the children would be there, that all the information they had indicated that Anderson was never without the children. Dkt. 126-8, at 38. Both deputy marshals testified that they knew that Anderson had threatened to kill his children if there was an attempt to apprehend him. Dkts. 102, at 12 and 126-8, 42.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 11

City of Homer officers - Sergeant Kuhns, Sergeant Hutt, Officer Luck, and Sergeant Shealy - testified that they knew that Anderson was considered armed and dangerous. Dkts. 132-3, at 4; 135-5, at 5; 136-4, at 3 and 136-2, at 4. All the City of Homer officers testified that they knew that Anderson had threatened to kill the children if they tried to arrest him. Dkts. 126-11, at 6; 135-6, at 2; 136-4, at 3; and 136-2, at 4. Sergeant Hutt, Officer Luck, and Sergeant Shealy testified that they knew that Anderson had threatened to have a shootout with police if they tried to arrest him. Dkts. 135-5, at 5; 136-4, at 3, and 136-2, at 4. Sergeant Kuhns testified that he assumed that the children would be with Anderson. Dkt. 126-11, at 6. Officer Luck testified that he was aware of the presence of the dog and Anderson "was known to have" the children. Dkt. 136-4, at 3. Sergeant Shealy testified that while at the airport, he was not informed that Anderson had the kids with him. Dkt. 182-18, at 4. Only Sergeant Hutt testified that he did not know that the children were in the car. Dkt. 102, at 29.

Sergeant Kuhns testified that he told the deputy marshals and other law enforcement that he'd rather arrest Anderson between the hours of 7:00 p.m. and 6:00 a.m. in case things did not go well. Dkt. 132-3, at 4.

## B. PROCEDURAL HISTORY

Plaintiffs' Amended Complaint makes the following federal claims:

1) violation of the children's Fourth Amendment rights against the U.S. Deputy Marshals pursuant to *Bivens;*

2) violation of the children's Fifth Amendment rights against the U.S. Deputy Marshals pursuant to *Bivens;*

3) violation of Ms. Dietzmann's Fifth Amendment rights against the U.S. Deputy Marshals pursuant to *Bivens;*

4) violation of the children's Fourth Amendment rights against the Homer police officers pursuant to 42 U.S.C. § 1983,

5) violation of the children's Fourteenth Amendment rights against the Homer police officers pursuant to 42 U.S.C. § 1983,

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 12

6) violation of the children and Ms. Dietzmann's Alaska Constitutional rights against the Homer police officers pursuant to 42 U.S.C. § 1983,

7) "Section 1983 damages against the City of Homer and Homer Police Department" for damages due to violations of J.A. and D.A.'s civil rights;

8) violation of Ms. Dietzmann's Fourteenth Amendment rights against the Homer police officers pursuant to 42 U.S.C. § 1983,

9) violations of Ms. Dietzmann's civil rights against the City of Homer pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978), and

10) violation of the FTCA against the United States. Dkt. 84.

Plaintiffs' Complaint, on behalf of all Plaintiffs, also makes state law claims for:

1) negligence against the City of Homer, Homer Police Department and Homer police officers, and

2) outrage against the City of Homer, Homer Police Department and Homer police officers. *Id.* Plaintiffs seek damages, attorneys' fees, and costs. *Id*.

Defendants assert, in part, in their Answers to the Amended Complaint, that they are entitled to an apportionment of fault against "other entities who may have caused Plaintiffs' damages" under AS 09.17.080, including Jason Anderson, Sr. and Ms. Dietzmann. Dkts. 86 and 91.

### C. ORGANIZATION OF OPINION

This opinion will address the pending motions as follows:

**Section I.** Children's Fourth Amendment Claims Against the Individual Defendants addresses:

1) the section of Plaintiffs' Motion for Partial Summary Judgment regarding seizure (Dkt. 101),

2) Federal Defendants' Cross Motion for Partial Summary Judgment That There Was No Fourth Amendment Seizure of Plaintiffs J.A. II and D.A. (Dkt. 118, redocketed as Dkt. 126),

3) Federal Defendants' Motion for Partial Summary Judgment on Plaintiffs' *Bivens*' Claims For Alleged Violations of Fourth Amendment Rights (Dkt. 158),

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 13

4) Homer Defendants' Cross Motion for Partial Summary Judgment on Fourth Amendment Claims (Dkt. 106, redocketed as Dkts. 107, 129, and 130).

**Section II.** Defendants' Defense of Apportionment/Limitation on Damages Regarding § 1983 and *Bivens* Based Claims addresses:

1) the remainder of Plaintiffs' Motion for Partial Summary Judgment (Dkt. 101).

**Section III**. Children's Substantive Due Process Claim Brought Pursuant to *Bivens* Against the Deputy Marshals and § 1983 Against the Individual City of Homer Defendants addresses:

1) Motion of Defendants John Olson, Jr., and Kevin Guinn for Summary Judgment on Plaintiffs' *Bivens* Claims for Alleged Violation of Fifth Amendment Rights (Dkt. 164),

2) a portion of City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159).

**Section IV.** Ms. Dietzmanns' Substantive Due Process Claim Brought Pursuant to *Bivens* Against Deputy Marshals Guinn and Olson and the § 1983 Against the Individual City of Homer Defendants addresses:

1) Federal Defendants' Motion to Dismiss Cherry Dietzmann's *Bivens* Claims Against Deputy Marshals Kevin Guinn and John Olson, Jr. as Barred by Statute of Limitations, (Dkt. 146), and

2) a portion of City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159).

**Section V.** Plaintiffs' § 1983 Claims Against the City of Homer addresses:

1) a portion of City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159).

**Section VI.** Plaintiffs' § 1983 Claims Against Chief Robl and Sergeant Kuhns addresses:

1) a portion of City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159).

**Section VII.** Plaintiffs' Alaska State Law Claims of Negligence and Outrage Asserted Against the Homer Defendants addresses:

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 14

1) City of Homer's Motion for Summary Judgment on State Claims (Dkt. 153).

**Section VIII**. Plaintiffs' Negligence and Outrage Claims Against the United States Pursuant to the FTCA addresses:

1) United States' Motion for Dismissal, Judgment on the Pleadings or Summary Judgment with Respect to Plaintiffs' Federal Tort Claims Act Claims and Any Claims Asserted Against the U.S. Marshal's Service or Against Deputy Marshals Olson and Guinn in their Official Capacity (Dkt. 163).

## DISCUSSION

### SUMMARY JUDGMENT - STANDARD

Summary judgment is proper only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the non moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."); *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The court must consider the substantive evidentiary burden that the nonmoving party must meet at trial – e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc.*, 809 F.2d at 630. The court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 15

moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc.*, 809 F.2d at 630 (relying on *Anderson, supra*). Conclusory, non specific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

## MOTION TO DISMISS - STANDARD

Federal Rule of Civil Procedure 8(a)(2) provides that a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Under Fed. R. Civ. P. 12 (b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted." Dismissal of a complaint may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory. *Balistreri v. Pacifica Police Department*, 901 F.2d 696, 699 (9th Cir. 1990). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (*internal citations omitted*).

Accordingly, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)(*citing Twombly*, at 570). A claim has "facial plausibility" when the party seeking relief "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* First, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.*, at 1950. Secondly, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* "In sum, for a complaint to survive a motion to dismiss the non-conclusory factual content, and reasonable inferences from that content must be plausibly suggestive of a claim entitling the pleader to relief." *Moss v. U.S. Secret Service,* 572 F.3d 962, 969 (9th Cir. 2009).

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 16

If a claim is based on a proper legal theory but fails to allege sufficient facts, the plaintiff should be afforded the opportunity to amend the complaint before dismissal. *Keniston v. Roberts*, 717 F.2d 1295, 1300 (9th Cir. 1983). If the claim is not based on a proper legal theory, the claim should be dismissed. *Id*. "Dismissal without leave to amend is improper unless it is clear, upon de novo review, that the complaint could not be saved by any amendment." *Moss v. U.S. Secret Service,* 572 F.3d 962, 972 (9th Cir. 2009).

## I. CHILDREN'S FOURTH AMENDMENT CLAIM AGAINST ALL INDIVIDUAL DEFENDANTS

Plaintiffs seek, in part, the following relief in their summary judgment motion: that the actions of Defendants Guinn, Olson, Hutt, Shealy, and Luck constituted a seizure of the children within the meaning of the Fourth Amendment. Dkt. 101.

The Defendants oppose Plaintiffs' motion regarding the Fourth Amendment, and make a cross motion for summary judgment arguing that: 1) there was no Fourth Amendment seizure of the children because the children were hostages, and/or a reasonable infant would not feel seized, 2) even if there was a seizure, the force used was reasonable, and 3) even if there was an unreasonable seizure, they are entitled to qualified immunity. Dkts. 118, 126 and 158 (Federal Defendants) and Dkts. 129-130 (Homer Defendants).

## QUALIFIED IMMUNITY

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Through application of the qualified immunity doctrine, public servants avoid the general costs of subjecting officials to the costs of trial - distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *V-1 Oil Co. v. Smith*, 114 F.3d 854, 857 (9th Cir. 1997)(*internal citations omitted*). The immunity is "immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

The Supreme Court established a two-part analysis in *Saucier v. Katz*, 533 U.S. 194, 201 (2001),

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 17

for determining whether qualified immunity is appropriate in a suit against a public official for an alleged violation of a constitutional right. *Boyd v. Benton County*, 374 F.3d 773, 778 (9th Cir. 2004), citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although no longer mandatory, the Supreme Court has recently held that it may be "beneficial" for a court required to rule upon qualified immunity to examine the *Saucier* factors: (1) whether the official violated the plaintiff's constitutional rights on the facts alleged and (2) if there was a violation, whether the constitutional rights were clearly established. *Pearson v. Callahan*, 129 S.Ct. 808, (2009) (holding that the *Saucier* two-part analysis was no longer mandatory).

### A.  CONSTITUTIONAL VIOLATION?

#### 1.  Were the Children Seized

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." "A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (*citations and quotations omitted*). "Thus, an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act." *Id.* (*citations and quotations omitted*). "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver even though the purpose of the stop is limited and the resulting detention quite brief." *Id.*, at 255, (*citations and quotations omitted*). The Supreme Court has held that as to passengers in a car that has been stopped by police, the relevant question is "whether a reasonable person in [the passenger's] position when the car stopped would have believed himself free to terminate the encounter between the police and himself." *Id.* at 256 (*citations and quotations omitted*).

In the circumstances here, when Deputy Marshal Olson pulled up in front of Anderson's vehicle and activated his lights while the Homer officers "boxed" Anderson in from behind, any reasonable

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 18

passenger in Anderson's vehicle would have would "have understood the police officers to be exercising control to the point that no one in the car was free to depart without police permission." *Id.* The federal Defendants' argument, that a "reasonable infant" would not feel they are subject to police scrutiny (Dkt. 118, at 15), fails to apply the proper "reasonable person standard" required under *Brendlin.*

The Federal and City of Homer Defendants argue that no seizure occurred here because the children were hostages. (Dkts. 118 and 129). They argue that the defendants were aware that Anderson was armed and dangerous and had threatened to kill himself and the children. *Id.* Defendants cite cases from other circuits for the proposition that where the plaintiff is a hostage of a suspect, no Fourth Amendment seizure of the plaintiff occurred. *Id.* (*citing, e.g., Landol-Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990); *Medeiros v. O'Connell*, 150 F.3d 164, 169 (2nd Cir. 1998); *Ewolski v. City of Brunswick,* 287 F.3d 492, 507 (6th Cir. 2002)).

The central problem with Defendants' analysis is that the cases cited all involve "hostages" who were either strangers to the suspect as in *Landol-Rivera* and *Medeiros*, or included related adults and child of the suspect, as in *Ewolski*. The cases cited involving children either who were strangers to the suspect, and/or included an adult parent. None of the hostage cases involved a suspect parent and his own infant children. Black's Dictionary defines a "hostage" as "an innocent person held captive by another who threatens to kill or harm that person if one or more demands are not met." There is no evidence that Anderson captured or took the children by force. Anderson was a custodial parent, his rights as a father had not been terminated. Ms. Dietzmann left the children with Anderson. Anderson was caring for the children as is evident by the fact that he informed the rental car company agent that he would be late getting to the airport because he had to feed his children and get them ready. The children were dressed appropriately for the weather, and had been strapped into to their car seats. Certainly, Anderson threatened to harm the children if there was an attempt to arrest him. But, Ms. Dietzmann testified that she didn't believe he'd actually do it. Additionally, Anderson did not make any demands directly to the police in exchange for the children. Further, Deputy Marshal Guinn testified that he would not characterize what they were doing as "rescuing the kids" or that this was a "hostage

situation." Dkt. 126-8, at 40 and 43. He testified that "[w]ell, we were there to make sure the kids were safe; yeah (affirmative), but the principal was to arrest Jason Anderson." Dkt. 126-8, at 41.

At best, Anderson's threats could be construed as a demand not to be arrested in exchange for not shooting the children. Accordingly, there are issues of fact as to whether the children were "hostages." Deputy Marshal Guinn did state that he felt that Anderson was using meth based on what Ms. Dietzmann told them (that Anderson was getting more and more erratic and paranoid, and felt like "bugs" were under the skin on his face). Dkt. 126-8, at 43. Deputy Marshal Guinn stated that he believed "those kids were living a minute-to-minute existence as long as they were in [Anderson's] presence." Dkt. 126-8, at 43.

If a jury concludes that the children were hostages, then under persuasive authority of several other circuits, the children were not seized pursuant to the Fourth Amendment. If the jury concludes that the children were not hostages, then a reasonable jury could conclude that the children were "seized" for Fourth Amendment purposes. A material issue of fact exists as to the hostage issue.

2.     Was the Seizure Reasonable?

Fourth Amendment claims of excessive force are analyzed under an objective reasonableness standard. *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010) (*internal citations omitted*). "To determine if a Fourth Amendment violation has occurred, we must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Id.*

a.     *Severity of Intrusion*

"First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Espinosa*, at 537.

The type of force used here was the boxing in of Anderson's vehicle and approach with weapons drawn, knowing that Anderson had the children, and had threatened to kill the children if confronted. In doing so, arguably, the Defendants caused the escalation that led to the shooting and provoked the

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 20

armed response. The level of the intrusion was severe.

### b. *Government Interest*

Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Espinosa*, at 537.

Anderson's crimes were severe. He was wanted on state assault charges and federal drug charges. This weighs heavily for the government. There are issues of fact, however, as to whether Anderson posed an immediate threat to the officers' or the public's safety. Prior to the attempt to confront Anderson, he was not resisting arrest or attempting escape. These two factors weigh against apprehending Anderson at that moment with the children present.

### c. *Balance*

"Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Espinosa*, at 537.

The officers here used significant force, in light of the need for such force. There are issues of fact as to whether the government's need to apprehend Anderson at that moment was outweighed by the great risk posed to the children and others such that the force used here was reasonable under the circumstances. Plaintiffs have pointed to expert testimony from which a jury could conclude that the defendants here "intentionally or recklessly provoke[d] a violent confrontation," and that "the provocation is an independent Fourth Amendment violation" under *Billington v. Smith,* 292 F.3d 1177 (9th Cir. 2002) and *Alexander v. City and County of San Franscisco,* 29 F.3d 1355 (9th Cir. 1994). Accordingly, the officers here may be held liable for the otherwise defensive use of deadly force. *Billington*.

There are issues of fact as to whether the officers' use of force here was reasonable.

## B.    CLEARLY ESTABLISHED?

All Defendants have asserted the defense of qualified immunity, which should be denied without prejudice. The Ninth Circuit has held under *Alexander* and *Billington* that an officer that commits an

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 21

independent Fourth Amendment violation by using unreasonable force could be held liable for shooting - even though they reasonably shot at the moment of the shooting - because they "used excessive force in creating the situation which caused [the man] to take the actions he did." In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force. There are many issues of fact: a grant of qualified immunity is not appropriate at this juncture.

## II.     DEFENDANTS' DEFENSE OF APPORTIONMENT/LIMITATION ON DAMAGES REGARDING § 1983 AND *BIVENS* BASED CLAIMS

In addition to seeking a ruling regarding whether the children were seized, Plaintiffs seek the following relief in their summary judgment motion: (a) Alaska's caps on non-economic and punitive damages (AS 09.17.010 and AS 9.17.020) do not limit recovery for federal constitutional claims, and (b) any defendant found liable for violations of Plaintiffs' constitutional rights under § 1983 or *Bivens* is jointly and severally liable and not subject to Alaska's rule of apportionment - AS 09.17.080. Dkt. 101.

Defendants do not dispute that Alaska's caps on non-economic and punitive damages (AS 09.17.010 and AS 9.17.020) do not limit recovery for federal constitutional claims, and Plaintiffs' motion in that regard should be granted.

Parties sued under 1983 and *Bivens* may be held jointly and severally liable for their actions. *See Hervey v. Estes,* 65 F.3d 784, 792 (9th Cir. 1995). However, 42 U.S.C. § 1983 "is authority enough to require each tortfeasor to pay its share of the cost of the remedy if it can, and apportionment of the cost is part of the equitable power of the District Court." *Missouri v. Jenkins,* 495 U.S. 33, 54 (1990)(holding that after finding that defendants were jointly and severally liable, district court did not err in apportioning fault). Other circuits have held that the determination of whether defendants should be held jointly and severally liable depends on whether the plaintiffs' injuries are divisible. *Harper v. Albert,* 400 F.3d 1052, 1061-62 (7th Cir. 2005).

Here, there are several issues of fact as to whether the Plaintiffs' injuries are divisible, including the issue of who actually shot J.A. Accordingly, whether the Defendants are jointly and severally liable for plaintiff's injuries is dependant on factual determinations. Summary judgment on this issue should

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 22

be denied.

Defendants point to no authority that they can apportion fault to a party who is not a defendant for claims brought under 1983 or *Bivens.* To the extent that they seek to apportion fault to a non-party for damages for claims under 1983 or *Bivens*, the Plaintiffs' motion should be granted.

### III. CHILDREN'S SUBSTANTIVE DUE PROCESS CLAIM BROUGHT PURSUANT TO *BIVENS* AGAINST THE DEPUTY MARSHALS AND §1983 AGAINST INDIVIDUAL CITY OF HOMER DEFENDANTS

The Federal Defendants move for summary judgment on the children's Fifth Amendment Substantive Due Process claim, asserted against them under *Bivens,* by arguing that: 1) to the extent that the Court permits the Fourth Amendment claim to proceed, the less textually explicit claim - the Fifth Amendment claim should be dismissed under *Graham v. Connor,* 490 U.S. 386, 395 (1989), 2) the "intent to harm" standard (rather than "deliberate indifference") applies when trying to decide if the deputy marshals' conduct "shocks the conscience" of the court, 3) under the "intent to harm" standard, the children cannot point to facts showing the deputy marshals intended to harm the children or acted for reasons unrelated to legitimate law enforcement purposes, 4) even if Plaintiffs were able to show that a constitutional violation occurred, the deputy marshals are entitled to qualified immunity. Dkt. 164.

The City of Homer moves for summary judgment on the children's Fourteenth Amendment Substantive Due Process claim, asserted against them under § 1983, by arguing that the Fourteenth Amendment's "shocks the conscience" test cannot be satisfied. Dkt. 160. Homer argues that in cases where an officer inadvertently harmed a bystander in fast paced circumstances presenting competing public safety concerns, the "purpose to harm" rather than the "deliberate indifference" standard applies. *Id.* Homer argues under either standard, no violation of the children's rights occurred, and even if it did, they are entitled to qualified immunity. *Id.*

### MORE TEXTUALLY EXPLICIT CONSTITUTIONAL PROVISION

Although the federal Defendants move for dismissal of the Fifth Amendment claim based the children's assertion of a Fourth Amendment claim, at this time the children should be able to present their Fifth and Fourteenth Amendment claims to the jury. The Fourth Amendment claim hinges, in part,

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 23

on whether the jury finds that the children were hostages. If the children are found to be hostages by the jury, then no Fourth Amendment seizure took place, but then, the events at the airport would then be analyzed under the Substantive Due Process clause.

## QUALIFIED IMMUNITY

### A.    CONSTITUTIONAL VIOLATION?

"The touchstone of due process is protection of the individual against arbitrary action of government." *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)(*internal quotations and citations omitted*). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *Id.*, at 846. Accordingly, "the cognizable level of executive abuse of power as that which shocks the conscience." *Id.* Different standards are used to judge the level of culpability required to be "conscience shocking," based on the circumstances. *Id.* For example, "deliberate indifference" is the standard applied in cases alleging a due process claim for inadequate medical treatment of a pretrial detainee. *City of Revere v. Massachusetts Gen. Hospital*, 463 U.S. 239 (1983). In cases of high speed police chases, the Supreme Court has held that "in such circumstances only a purpose to cause harm unrelated to the legitimate object of arrest will satisfy the element of arbitrary conduct shocking to the conscience, necessary for a due process violation." *Lewis,* at 836.

The U.S. Supreme Court has held that the "deliberate indifference" standard should be used when "actual deliberation is practical," and "in the custodial situation of a prison, forethought about an inmate's welfare is not only feasible but obligatory under a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Lewis*, at 851.

1.    <u>Deputy Marshals</u>

The first issue is which standard applies - "intent to harm" or 'deliberate indifference."

There are issues of fact as to the length of time the deputy marshals had to deliberate the risks associated with arresting Anderson outside the airport. The deputy marshals discussed a few different plans when they realized that Anderson was not coming into the terminal. They were aware that the airport was filling up with people for the 6:30 p.m. flight. At a minimum, they assumed that Anderson

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 24

had his children with him and was armed.  The deputy marshals were present at several of the meetings leading up to the arrest in which different plans to arrest Anderson were discussed.  They were there when Trooper Dunn indicated that the AST would not participate in a plan which did not separate Anderson from his children because it was too dangerous.

Plaintiffs also argue that while there were competing public safety concerns, there were not competing public safety obligations.  Dkt. 176.  That is, that the officers were not under an obligation to arrest Anderson at that moment, but they were under an obligation to ensure the safety of innocent bystanders, including the children.  Dkt. 176, at 10.

### a. *Intent to Harm Standard*

A jury could conclude that the deputy marshals were faced with a situation which was "quickly evolving and escalating, prompting repeated split-second decisions." *Porter v. Osborn*, 546 F.3d 1131 (9th Cir. 2008).  If a jury concludes that the deputy marshals did not have time to deliberate the risks of the arrest outside, then the intent to harm standard applies, and the claim would be subject to dismissal. There are no facts to suggest that the deputy marshals' "purpose was to cause harm unrelated to the legitimate object of arrest." *Porter,* at 1140.

### b. *Deliberate Indifference*

If a jury concludes that the deputy marshals did have time to consider the risks of the plan to arrest Anderson outside, than, the deliberate indifference standard applies. *See Lewis*, at 851

Plaintiffs cite the "state created danger" line of cases, and argue that the defendants here placed the children in a situation more dangerous then when they found them.  Dkt. 176.  Application of these cases is doubtful.

"Deliberate indifference occurs when an official acted or failed to act despite his knowledge of a substantial risk of serious harm."  *Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir.2008). There are issues of fact as to whether the deputy marshals knew of the children's presence in the car and the substantial risk the children faced.  Accordingly, there are issues of fact as to whether the deputy marshals were deliberately indifferent to the children's substantive due process right to personal safety.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 25

The deputy marshals argue that Deputy Marshal Guinn did not take part in the "box in" procedure or fire his weapon. Dkt. 164, at 21. They argue that the children's substantive due process claim against him should be dismissed because he did not personally participate. A person deprives another of a constitutional right, where that person does an affirmative act, participates in another's affirmative acts, or omits to perform an act which that person is legally required to do that causes the deprivation of which complaint is made." *Hydrick v. Hunter,* 500 F.3d 978, 988 (9th Cir. 2007) (*citing Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). The "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* Here it is undisputed that Deputy Marshal Guinn formulated the plan to arrest Anderson outside with Deputy Marshal Olson with full knowledge of the presence of the children and Anderson's threats. Deputy Marshal Guinn testified that he told Sergeant Hutt, Officer Luck, and Sergeant Shealy to drive Officer Luck's truck in around behind Anderson's SUV, box in his vehicle, and arrest Anderson from behind. These facts, if believed by a jury, are sufficient to find that Deputy Marshal Guinn set into "motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Hydrick* at 743.

> 2.   Homer Defendants

The Homer officers argue that the change from the first plan (apprehension of Anderson inside the terminal) to the second plan was made in a matter of two minutes. The Homer officers argue that they had no time to deliberate and so the "intent to harm standard" should be applied to them. Dkt. 160.

Although a closer question, there are issues of fact as to the length of time the Homer officers had to deliberate the risks associated with arresting Anderson outside the airport. Plaintiffs point out that the Homer officers were present at several of the meetings leading up to the arrest in which different plans to arrest Anderson were discussed. Many of them were at the meetings where the Alaska State Trooper Dunn, after consulting with his superiors, told them that the troopers would not participate in a

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 26

1    plan which did not separate Anderson from his children because it was too dangerous.

2                                    a.    *Intent to Harm Standard*

3            Like the case of the deputy marshals, a jury could conclude that the Homer Defendants were

4    faced with a situation which was "quickly evolving and escalating, prompting repeated split-second

5    decisions." *Porter v. Osborn,* 546 F.3d 1131 (9th Cir. 2008). If a jury concludes that the Homer

6    officers did not have time to deliberate the risks of the arrest outside, then the intent to harm standard

7    applies, and the claim would be subject to dismissal. There are no facts to suggest that the Homer

8    officers' "purpose was to cause harm unrelated to the legitimate object of arrest." *Porter,* at 1140.

9                                    b.    *Deliberate Indifference*

10           If a jury concludes that the Homer Defendants did have time to consider the risks of the plan to

11   arrest Anderson outside, than, the deliberate indifference standard applies. *See Lewis*, at 851

12           "Deliberate indifference occurs when an official acted or failed to act despite his knowledge of a

13   substantial risk of serious harm." *Solis v. County of Los Angeles*, 514 F.3d 946, 957 (9th Cir.2008).

14   There are issues of fact as to whether the Homer officers knew of the children's presence in the car and

15   the substantial risk the children faced. Accordingly, there are issues of fact as to whether they were

16   deliberately indifferent to the children's substantive due process rights.

17           **B.    CLEARLY ESTABLISHED?**

18           As was the case with the children's Fourth Amendment claim, there are too many issues of fact

19   to decide whether the individual defendants are entitled to qualified immunity at this time.

20   **IV.   MS. DIETZMANN'S SUBSTANTIVE DUE PROCESS CLAIM BROUGHT PURSUANT
          TO *BIVENS* AGAINST DEPUTY MARSHALS GUINN AND OLSON, AND § 1983**
21   **AGAINST THE HOMER DEFENDANTS**

22           Ms. Dietzmann asserts a Substantive Due Process claim against the deputy marshals and Homer

23   officers for violation of her right to family unity. Dkt. 83.

24           **A.    FEDERAL MOTION TO DISMISS BASED ON STATUTE OF LIMITATIONS**

25           Federal Defendants seek dismissal of Ms. Dietzmann's Substantive Due Process claim brought

26   against them pursuant to *Bivens* because they contend that the statute of limitations had run. Dkt. 147.

27

28   Order on the Parties' Motions for Summary Judgment and Various Other Motions - 27

The claim accrued at the Homer Airport on March 1, 2006. Dkt. 83. Ms. Dietzmann filed an administrative claim against the United States, under the Federal Tort Claims Act, on January 31, 2008. Dkt. 147-1, at 6. Ms. Dietzmann also filed a state court action against the City of Homer Defendants in February of 2008. Dkt. 147-2. On January 30, 2009, Plaintiffs filed this action against the United States, the Marshal's Office, and individual deputy marshals. Dkt. 1. The City of Homer Defendants did not file an answer or responsive pleading in the state court action until September 29, 2009, when they filed an Answer and Third Party Complaint. Dkt. 167-5, at 16. The City of Homer named the United States as a defendant in their third party complaint and made a claim for apportionment against them pursuant to AS 09.17.080. *Id*., at 16.

State personal injury statutes of limitations are applied to claims brought under 42 U.S.C. § 1983 and pursuant to *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388 (1971). *Van Strum v. Lawn*, 940 F.2d 406, 408-10 (9th Cir.1991). Under Alaska law, a claim for personal injury must be made within two years. AS 09.10.070. "While the statute of limitations period is derived from state law, federal law determines when the statute of limitations period accrues. A *Bivens* claim accrues when the plaintiff knows or has reason to know of the injury." *Western Center for Journalism v. Cederquist*, 235 F.3d 1153, 1156 (9th Cir. 2000) (*internal citations omitted*).

Ms. Dietzmann's Substantive Due Process claims, brought against the individual deputy marshals pursuant to *Bivens* should be dismissed as barred by the statute of limitations. Ms. Dietzmann does not dispute that she was aware that the attempted arrest of Anderson and shoot out that injured her son occurred on March 1, 2006. She does not dispute that she was aware of the deputy marshals' identities. Ms. Dietzmann retained counsel within two days after the incident. Dkt. 147-1, at 7. She was aware of the factual basis of her injuries on March 1, 2006, and so, her claim accrued on March 1, 2006. Under the Alaska personal injury statute, Ms. Dietzmann had two years, until March 1, 2008, to file her *Bivens* claim against the deputy marshals. She did not file her claim until January 30, 2009. Dkt. .1

Ms. Dietzmann argues that her substantive due process claim should not be dismissed based on

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 28

the statute of limitations under the Alaska Supreme Court holding in *Alaska General Alarm, Inc. v. Grinnell*, 1 P.3d 98 (Alaska 2000). In *Grinnell,* a defendant filed a third party complaint for apportionment against another party after the statute of limitations had run on the plaintiff's claims. *Id.* The Alaska Supreme Court held that a third-party defendant may sue other potentially liable parties for apportionment of fault under AS 09.17.080 after the statute of limitations on the plaintiff's underlying claim had run. *Id.*, at 100. The *Grinnell* Court held that a claim for apportionment, raised in the same suit, was not barred because it was a distinct claim from a plaintiff's tort claim. *Id.*, at 105. The *Grinnell* Court did not address application of the statute of limitations to a plaintiff's claim. Plaintiffs have failed to show that *Grinnell* applies here to allow Ms. Dietzmann's claim to proceed.

Plaintiffs further argue that the complaint that they filed against the City of Homer and Alaska State Troopers in Alaska state court and the federal administrative claim that they filed put the federal defendants on notice that a *Bivens* claim would be asserted. Plaintiffs argue that the Federal Defendants had constructive knowledge of the claim. Dkt. 167. Plaintiffs cite no authority for their contention that they are excused from filing a claim against the Federal Defendants within the period required by statute because the Federal Defendants had constructive knowledge of the claim.

Further, Plaintiffs argue that the statute of limitations should be deemed tolled while the criminal investigation of Deputy Marshals Guinn and Olson was ongoing. Dkt. 167. Plaintiffs refer to a decision in an unpublished case *Peel v. State of Alaska*, cause number A90-186, from 1983. Dkt. 167. Plaintiffs do not provide the Court a copy of the decision attached to the brief as required by District of Alaska Local Rule 7.1 (c) (1) (B) nor does any evidence of the decision appear in the Court's electronic filing system under this case number. Later review of the record reveals that the decision was attached to an affidavit in response to the City of Homer's Motion for Summary Judgment: Re: Alaska State Claims. Dkt.173-10. In *Peel*, the Plaintiff was tried and convicted of several crimes for which he was later acquitted on appeal. Mr. Peel then sued the prosecutors and police involved in his criminal case. The Court in his civil case tolled the statute of limitations for the period of time in which the criminal case was ongoing since Mr. Peel would have asserted his Fifth Amendment rights and the state would have

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 29

asserted other privileges. The ruling in *Peel* is inapplicable here. Mr. Peel's claims did not accrue until after his acquittal. Additionally, no criminal charges were filed against any party in this case. Further, the Plaintiffs here were not criminal defendants. Plaintiffs have provided no competent legal authority for their proposition, and it should be rejected.

The Federal Defendants motion to dismiss Ms. Dietzmann's Substantive Due Process claim, brought against them pursuant to *Bivens*, (Dkt. 147) should be granted. Ms. Dietzmann's Substantive Due Process claim, brought against the individual deputy marshals pursuant to *Bivens* should be dismissed as barred by the statue of limitations.

### B. HOMER DEFENDANTS' MOTION TO DISMISS MS. DIETZMANN'S SUBSTANTIVE DUE PROCESS CLAIM

As was the case with the children's due process claim, Homer argues that the "intent to harm" standard applies to Ms. Dietzmann's claim. Dkt. 160. As with the children's claims, there are issues of fact precluding summary judgment on whether there was a violation, and whether qualified immunity is appropriate at this time.

### V. PLAINTIFFS' § 1983 CLAIMS AGAINST THE CITY OF HOMER

Plaintiffs assert that the City of Homer and Homer Police Department did not adequately train/supervise/establish procedures to deal with a hostage situation and/or arrest in the presence of innocent parties. Dkt. 83 (Claims seven, nine, and ten). The City moves to dismiss the § 1983 claims asserted against it, arguing that Plaintiffs can not show that Homer was deliberately indifferent in training/supervising/establishing procedures to deal with hostage situations and/or arrests in the presence of innocent parties. Dkt. 160, at 5.

In order to set forth a claim against a municipality under 42 U.S.C. § 1983, a plaintiff must show that the defendant's employees or agents acted through an official custom, pattern or policy that permits deliberate indifference to, or violates, the plaintiff's civil rights; or that the entity ratified the unlawful conduct. *See Monell v. Department of Social Servs.*, 436 U.S. 658, 690-91 (1978); *Larez v. City of Los Angeles*, 946 F.2d 630, 646-47 (9th Cir. 1991). The municipal action must be the moving force behind the injury of which plaintiff complains. *Board of County Commissioners of Bryan County v. Brown*,

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 30

1  520 U.S. 397, 405 (1997).

2      Plaintiffs do not dispute Homer's motion regarding training/supervising/establishing procedures.

3  These claim against Homer should be dismissed.

4      Plaintiffs argue, instead, that Chief Robl's ratification of the Homer officers participation in the

5  attempted arrest of Anderson outside the airport is the basis for municipal liability here. Dkt. 176. They

6  argue that he ratified the officers' conduct by choosing not to punish them. *Id*.

7      A local government may be held liable under § 1983 when an official with final policy-making

8  authority ratified a subordinate's unconstitutional decision or action and the basis for it. *Clouthier v.*

9  *County of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010)(*internal quotation marks and citations*

10 *omitted*). "There must, however, be evidence of a conscious, affirmative choice on the part of the

11 authorized policymaker." *Id.*

12     Plaintiffs § 1983 claims against the City of Homer and Homer Police Department should be

13 dismissed. Plaintiffs have failed to point to evidence that Chief Robl made a "conscious, affirmative

14 choice" to approve the Homer officer's participation in the attempted arrest of Anderson outside the

15 airport and the basis for the decision to participate in the plan. *Clouthier,* at 1250. Plaintiffs have failed

16 to provide a basis upon which the City of Homer or the Homer Police Department should be held liable

17 under § 1983.

18     Plaintiffs do not dispute that their claim for a violation under the Alaska Constitution, asserted

19 against the Homer Defendants pursuant to § 1983, should be dismissed.

20 **VI.  PLAINTIFFS' § 1983 CLAIMS AGAINST CHIEF ROBL AND SERGEANT**
         **KUHNS**
21
        The Homer Defendants' motion to summarily dismiss the § 1983 claims asserted against Chief
22
   Robl and Sergeant Kuhns (Dkt. 159) should be granted.
23
        It is undisputed that Chief Robl was not aware that Anderson had the children with him the day
24
   of the attempted arrest. It is undisputed that although Chief Robl gave his permission for the Homer
25
   officers to participate in the arrest inside the terminal, he was not consulted about the attempted arrest
26
   plan outside the terminal. Plaintiffs' Fourth and Fourteenth Amendment claims, asserted against him
27

28 Order on the Parties' Motions for Summary Judgment and Various Other Motions - 31

pursuant to § 1983, should be dismissed.

Likewise, the § 1983 claims asserted against Sergeant Kuhns should be dismissed. Sergeant Kuhns, who was inside the terminal, was not aware that the plan had changed from arresting Anderson inside the terminal to making the attempt outside the terminal until Deputy Marshal Guinn ran by yelling "it was going down outside," or some statement of that nature. Sergeant Kuhns did not fire his weapon and arrived on the scene after the gunfire had stopped. There is no evidence from which to construe that he personally participated in the new plan or in the shootout. Accordingly, the Plaintiffs' § 1983 claims asserted against him should be dismissed.

## VII. PLAINTIFFS' ALASKA STATE LAW CLAIMS OF NEGLIGENCE AND OUTRAGE ASSERTED AGAINST THE HOMER DEFENDANTS

Plaintiffs' Complaint makes Alaska state law claims for negligence and outrage against the Homer Defendants. Dkt. 84. The Homer Defendants raise the defense of qualified immunity under Alaska law. Dkt. 154. The Homer Defendants argue that the officers' actions were discretionary and were done in good faith. *Id.* They argue that they could have reasonably believed that their actions were reasonable. *Id.* The Homer Defendants argue that D.A. has no state law negligence claim because she suffered no shock from the shoot out. *Id.* The Homer Defendants argue that the Plaintiffs' claim for outrage (intentional infliction of emotional distress) should be dismissed because the officers' actions were objectively reasonable. *Id.* Homer Defendants argue that Plaintiffs claim for punitive damages should be dismissed because they can not show outrageous conduct or conduct that evidenced "reckless indifference." *Id.* The Homer Defendants also point out that, under Alaska law, there can be no claim for punitive damages against the city. *Id., (citing Richardson v. Fairbanks North Star Borough*, 705 P.2d 454, 456 n.1 (Alaska 1985). The Homer Defendants also move for dismissal of the state claims against Sergeant Kuhns and Chief Robl. *Id.*

### A. HOMER DEFENDANTS MOTION FOR SUMMARY DISMISSAL BASED ON STATE QUALIFIED IMMUNITY

The Homer Defendants argue that Alaska uses a two part inquiry when examining claims of qualified immunity in excessive force cases. Dkt. 154. They argue that they must meet the standards

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 32

under AS 09.65.070 (d)(2) and as announced under *Sheldon v. City of Ambler*, 178 P.3d 459, (Alaska 2008). *Id.*

Under AS 09.65.070 (d)(2), municipalities and their employees are immunized from civil liability for claims "based upon the exercise of or performance or the failure to exercise or perform a discretionary function or duty." It is unclear that this statute applies. The Alaska Supreme Court has held that:

> This statute expresses a type of official immunity. For purposes of official immunity, discretionary actions are those that require personal deliberation, decision and judgment. This type of discretionary immunity differs from immunity for discretionary actions in a sovereign immunity context. In the latter context the usual inquiry is whether the act in question should be regarded as operational, and thus not immune, or policy based, and thus immune. Further, while discretionary function immunity for sovereign immunity purposes is not qualified, discretionary function official immunity is qualified.

*Pauley v. Anchorage School Dist.*, 31 P.3d 1284, 1285-86 (Alaska 2001). The acts at issue here appear to be "operational" and not "policy" based. "Under a rule of qualified immunity, a public official is shielded from liability only when discretionary acts within the scope of the official's authority are done in good faith and are not malicious or corrupt." *Pauley v. Anchorage School Dist.*, 1 P.3d 1284, (Alaska, 2001).

In any event, Plaintiffs do not dispute that the Homer Defendants decision to participate in the plan to arrest Anderson was "discretionary" as contemplated under AS 09.65.070 (d)(2). There is no evidence that the Homer Defendants here did not act in good faith or were malicious or corrupt, so the first requirement under Alaska law is met.

Secondly, Alaska applies a standard similar to the federal standard when considering qualified immunity in excessive force cases. *Estate of Logusak ex rel. Logusak v. City of Togiak*, 185 P.3d 103, 110 (Alaska 2008) (citing *Sheldon v. City of Ambler*, 178 P.3d 459, (Alaska 2008)). That is: 1) Were the officers' actions objective reasonable? 2) Could the officers have reasonably believed that their actions were reasonable? *Sheldon,* at 463.

       1.    <u>Objectively Reasonable?</u>

The Homer Defendants concede that there are issues of fact as to whether the decision to

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 33

1   participate in the plan to arrest Anderson outside the airport was objectively reasonable.  Dkt. 192, at 6.

2   "The Homer Defendants will assume that a jury could find them unreasonable (negligent) for

3   participating in Plan B due to the risk of harm to the children and that one of Plaintiffs' experts' other

4   plans would have reduced the risk and was reasonable." *Id.*

5                    2.    Reasonable Objective Belief?

6          There are issues of fact as to whether the Homer Officers' could have reasonably believed that

7   participation in the plan to arrest Anderson outside was reasonable.

8          Peter C. Sarna opined, on behalf of Plaintiffs, that

9          The operational planning for the March 1, 2006, Homer Airport arrest of Jason Anderson
           and the execution of the hastily improvised backup "vehicle takedown" plan in the
10         airport parking lot violated basic police tactical and risk management principles, and
           omitted consideration of the most basic and important contingency foreseeable - that
11         Jason Anderson would not enter the terminal to exchange the vehicle keys.  The resultant
           plan was seriously deficient from both tactical and safety standpoints.  No reasonable
12         officer would have undertaken the plan because of its glaring shortcomings, the
           participating officers' lack of specialized capabilities, the obvious low chances of success
13         and the grave jeopardy in which it placed the two children.

14  Dkt. 173-4, at 4.  Defendants argue that the officers were forced to weigh the risks of harm to the

15  children, and could have reasonably believed that the children were placed at less risk by having

16  Anderson arrested immediately, rather than wait.  A jury could also conclude that the officers could not

17  have reasonably believed that the children were at less risk when they choose to force the arrest in light

18  of the fact that the officers knew that Anderson was likely armed and he had threatened to shoot the

19  children if an attempt was made to apprehend him.  Further, there was no information that Anderson had

20  harmed the children at that point, and although he had harmed Ms. Dietzmann, she had escaped him.

21  Moreover, the Homer officers were aware that the Alaska State Troopers felt that no arrest should be

22  attempted unless the children could be separated from Anderson.  Under these circumstances, there are

23  issues of fact as to whether the officers could have reasonably believed that participation in the plan to

24  arrest Anderson outside the terminal was reasonable.  Their motion to dismiss the state law claims based

25  on qualified immunity should be denied without prejudice.

26         **B.     HOMER'S MOTION TO SUMMARILY DISMISS D.A.'S NEGLIGENCE CLAIM**

27

28  Order on the Parties' Motions for Summary Judgment and Various Other Motions - 34

1    It is undisputed that D.A., who was less than six months old at the time, did not have any

2    physical injuries as a result of the events at the Homer Airport. Consequently, the damages she appears

3    to be asserting as a result of the Defendants' allegedly negligent conduct at the airport is emotional

4    distress damages. In Alaska, "[t]he general rule is that where a tortfeasor's negligence causes emotional

5    distress without physical injury, such damages may not be awarded." *Hancock v. Northcutt*, 808 P.2d

6    251, 257 (Alaska 1991). Alaska recognizes an exception to this rule in claims of plaintiffs who have

7    suffered emotional distress upon observing a loved one who has been physically injured by the act of a

8    tortfeasor. *Id.* An exception to the general rule is found where "the plaintiff is shocked by observing

9    the physically injured victim more or less contemporaneously with the plaintiff's learning of the nature

10   of the victim's injuries." *Id.*

11   Here although D.A. was present for her father and brother's injuries, there is no credible

12   evidence that at less than six months old, she was "shocked" by observing any of these events. Her

13   claim for negligence should be dismissed.

14   **C.     HOMER'S MOTION TO SUMMARILY DISMISS OUTRAGE CLAIM**

15   In a claim for outrage (or intentional infliction of emotional distress), Alaska recognizes an

16   additional exception to their general rule regarding the recovery emotional damages from a tortfeasor.

17   *Hancock* at 258. It limits "the recovery of emotional distress damages unaccompanied by physical

18   injuries to cases (1) where the emotional distress is "severe," (2) where the conduct of the tortfeasor is

19   intentional or reckless, and (3) where such conduct is capable of being characterized as extreme or

20   outrageous." *Hancock* at 258.

21        1.     D.A. and Ms. Dietzmann's Outrage Claims

22   As was the case with her claim for negligence, D.A.'s outrage claim should be dismissed as she

23   has failed to show that her "emotional distress is severe."

24   Ms. Dietzmann's claim for outrage should also be dismissed as is discussed in Section VIII. E.

25   below.

26        2.     J.A.'s Outrage Claim

27

28   Order on the Parties' Motions for Summary Judgment and Various Other Motions - 35

The Homer Defendants do not contest that J.A. suffered severe physical and emotional distress. The first prong is met. The Homer Defendants argue that his claim for outrage should be dismissed because the Homer officers' conduct was objectively reasonable and could not be characterized as intentional or reckless. As above, there are issues of fact as to whether the officers' conduct was reckless.

Further, the Homer Defendants argue that J.A.'s claim should be dismissed because the officers' conduct was not outrageous. In Alaska, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038, 1043 (1986). The Alaska Supreme Court has held that the typical case "is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Kavorkian*, at 1043-44. The Court can not say that there are no issues of fact as to whether the conduct here was extreme or outrageous.

The Homer Defendants' motion for summary judgment on D.A. and Ms. Dietzmann's claims for outrage should be granted. The Homer Defendants' motion as to J.A.'s outrage claim should be denied.

### D.    HOMER'S MOTION ON PLAINTIFFS' CLAIM FOR PUNITIVE DAMAGES

Under AS 09.17.020 (b), a "fact finder may make an award of punitive damages only if the plaintiff proves by clear and convincing evidence that the defendant's conduct: (1) was outrageous, including acts done with malice or bad motives; or (2) evidenced reckless indifference to the interest of another person." "A showing of malice is not required. It is sufficient to show that the defendant's conduct amounted to reckless indifference to the rights of others, and conscious action in deliberate disregard of those rights." *Maddox v. Hardy*, 187 P.3d 486 (Alaska 2008) (*internal citations omitted*). In deciding what conduct amount to "reckless indifference" the Alaska Supreme Court stated that it is "persuaded by the comments to the Restatement (Second) of Torts § 500, which define reckless disregard of safety." *Hayes v. Xerox Corp.*, 718 P.2d 929 (Alaska 1986). Those comments provide:

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 36

Conduct cannot be in reckless disregard of the safety of others unless the act or omission is itself intended, notwithstanding that the actor knows of facts which would lead any reasonable man to realize the extreme risk to which it subjects the safety of others. It is reckless for a driver of an automobile intentionally to cross a through highway in defiance of a stop sign if a stream of vehicles is seen to be closely approaching in both directions, but if his failure to stop is due to the fact that he has permitted his attention to be diverted so that he does not know that he is approaching the crossing, he may be merely negligent and not reckless.

*Id.* (*citing* Restatement (Second) of Torts § 500 comment (b) (1964) (emphasis added)).

Plaintiffs' punitive damages claim should not be dismissed because there is evidence from which a jury could conclude that the Homer officers acted with reckless indifference to the children's interests. Dkt. 172.

Plaintiffs do not dispute that a claim for punitive damages under AS 09.17.020 is not viable against the City. To the extent that Plaintiffs make a claim for punitive damage against Homer or the Homer Police Department, it should be dismissed.

### E. HOMER'S MOTION TO DISMISS THE NEGLIGENCE AND OUTRAGE CLAIMS AGAINST CHIEF ROBL AND SERGEANT KUHNS

There is no evidence in the record to conclude that Chief Robl breached a duty to Plaintiffs so their negligence claim against him should be dismissed. Further, there is no evidence he engaged in culpable conduct. Plaintiffs claims against him should be dismissed.

Plaintiffs argue that Kuhns was the supervisory officer at the scene. Dkt 172. Plaintiffs argue that Kuhns was involved in the planning and was on site. Plaintiffs argue that Kuhns should have told the deputy marshals that "neither he nor his other Homer Police officers would participate because the new "Plan B" violated protocol to separate Anderson from his children before initiating a likely violent confrontation." Dkt. 172, at 35. Plaintiffs fail to show that Kuhns was aware that the plan had changed before it had already been set into motion. Sergeant Kuhns testified that from his position inside the terminal, he saw Deputy Marshal Olson drive by the front of the terminal and then Deputy Marshal Guinn ran by yelling that it was "going to go down outside." Dkt. 132-2, at 5. Sergeant Kuhns states that he was not privy to any of the conversations between the deputy marshals, but ran out of the terminal to help. Dkt. 132-5. It is undisputed that he did not fire any shots. Plaintiffs' state law claims

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 37

1    against him should be dismissed.

2    **VIII.  PLAINTIFFS' NEGLIGENCE AND OUTRAGE CLAIMS AGAINST THE UNITED STATES PURSUANT TO THE FTCA**

3

4    Plaintiffs' Complaint  makes negligence and outrage claims against the United States pursuant to

5    the FTCA.  Dkt. 84.

6    The Federal Defendants move for summary dismissal of this claim on the ground of sovereign

7    immunity, arguing first, that Plaintiffs challenge a discretionary decision to make an arrest at the time

8    and manner they did, and because the conduct was not governed by any specific and mandatory statute,

9    regulation or policy, the claims fall within the "discretionary function" exception in 28 U.S.C. § 2680

10   (a).  Dkt. 163.  The Federal Defendants further argue that applicable state law would not afford relief to

11   Plaintiffs.  *Id*.  Further, the Federal Defendants argue that there is no evidence of negligence or outrage

12   on the part of the U.S. Marshals.  *Id*.  The Federal Defendants move for dismissal of this claim to the

13   extent that it is asserted against any of the other federal defendants except the United States.  *Id*.

14   **A.    DISCRETIONARY FUNCTION EXCEPTION TO FTCA**

15   The FTCA "is a limited waiver of sovereign immunity, making the Federal Government liable to

16   the same extent as a private party for certain torts of federal employees acting within the scope of their

17   employment."  *U. S. v. Orleans*, 425 U.S. 807, 813 (1976).  "The FTCA qualifies its waiver of sovereign

18   immunity for certain categories of claims (13 in all).  If one of the exceptions applies, the bar of

19   sovereign immunity remains."  *Dolan v. U.S. Postal Service*, 546 U.S. 481, 485 (2006).

20   The Federal Defendants argue that Plaintiffs' negligence and outrage claims are barred by the

21   discretionary function exception to the FTCA.  Dkt. 163.  The discretionary function exception to the

22   FTCA provides that the United States is not liable for:

23       Any claim based upon an act or omission of an employee of the Government, exercising
         due care, in the execution of a statute or regulation, whether or not such statute or
24       regulation be valid, or based upon the exercise or performance or the failure to exercise
         or perform a discretionary function or duty on the part of a federal agency or an
25       employee of the Government, whether or not the discretion involved be abused.

26   28 U.S.C. § 2680(a).  "The exception covers only acts that are discretionary in nature, acts that involve

27   an element of judgment or choice, and it is the nature of the conduct, rather than the status of the actor

28   Order on the Parties' Motions for Summary Judgment and Various Other Motions - 38

that governs whether the exception applies." *U.S. v. Gaubert*, 499 U.S. 315, 322 (1991) (*internal citations and quotations omitted*). There is a two step analysis in deciding whether the exception applies. *Terbush v. U.S.,* 516 F.3d 1125, 1129 (9th Cir. 2008).

The first inquiry is a determination of whether a federal statute, regulation, or policy specifically prescribes a course of action. *Terbush*, at 1129. If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the requirement of judgment or choice is not satisfied because the employee has no rightful option but to adhere to the directive. *Gaubert.*, at 322.

If the course of action is not specifically prescribed, then conduct likely involves an element of judgment or choice, and the second inquiry is appropriate. *Id.* The second inquiry is whether the judgment or choice is of the "kind that the discretionary function exception was designed to shield." *Id.* at 322-323. "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Id.*

The government bears the burden of proving that the discretionary function exception applies. *Terbush*, at 1129.

1.  <u>Mandated Conduct</u>*?*

"If a regulation mandates particular conduct, and the employee obeys the direction, the Government will be protected because the action will be deemed in furtherance of the policies which led to the promulgation of the regulation." *Gaubert,* at 323.

"If the employee violates the mandatory regulation, there will be no shelter from liability because there is no room for choice and the action will be contrary to policy." *Gaubert,* at 323.

The AFTF's Memorandum of Understanding ("MOU") provides that,

The purpose of the MOU is to outline the joint mission of the Alaska State Troopers, Anchorage Police Department, Federal Bureau of Investigation, and the United States Marshals Service, District of Alaska. . . This MOU will formalize the policy guidance and planning between the participating agencies. . . Supervision of the personnel assigned to the task Force will be the responsibility of the United States Marshals Service Chief Deputy ("CDUSM").

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 39

Dkt. 126-1, at 1-2.  The MOU further provides that,

**HOSTAGE AND BARRICADE SITUATION**
Upon the first indication of a hostage or barricade situation the CDUSM will be notified and request for tactical unit assistance from the nearest available agency will be made. The CDUSM may also make the decision to request assistance from a tactical unit in other situations which are deemed "high threat."  Upon arrival of the tactical unit, the tactical unit leader will assume command of the situation.  The CDUSM will advise other participating Task Force agency members of the hostage or barricade situation.

Dkt. 126-1, at 5.

There are issues of fact as to whether this was a hostage situation as was discussed in the analysis of the Fourth Amendment claim.  The express language of the MOU is mandatory in regard to hostage situations.  The CDUSM "will" be notified and a request for a tactical unit "will be made."  Dkt. 126-1, at 5.  If a jury concludes that this was a hostage situation, then there will be no shelter from liability under the discretionary function exception, because "there is no room for choice and the action[s] taken [here] will be contrary to policy."  *Gaubert,* at 323.

If a jury concludes that this was not a hostage situation, then the MOU's requirement do not apply.  Accordingly, the second inquiry should be examined.  *Gaubert.*, at 322.

2.  <u>Choice the Kind the Exception was Intended to Shield</u>?

The second inquiry is whether the judgment or choice is of the "kind that the discretionary function exception was designed to shield."  *Gaubert.*, at 323.  "Congress has not waived the government's sovereign immunity against all law enforcement acts or omissions."  *Doe v. U.S.,* 58 F.3d 494, 500 (9th Cir. 1995).  The Ninth Circuit has held that "[w]hile law enforcement involves exercise of a certain amount of discretion on the part of individual officers, such decisions do not involve the sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability."  *Garcia v. U.S.*, 826 F.2d 806, 809 (9th Cir. 1986).  In *Garcia*, a Mexican citizen asserted negligence, assault and battery claims against United States pursuant to the FTCA to recover for injuries he received when he was shot by border patrol agent.  *Id.*  The Court concluded that the discretionary function exception to the FTCA did not apply.  *Id.*

Here, as in *Garcia*, the manner in which the Federal Defendants carried out the plan to arrest is

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 40

not the "sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability." *Garcia* at 809. To the extent that the Federal Defendants allege that they had complete discretion under the federal arrest statutes such that the exception applies, they are mistaken. In the Ninth Circuit, "the Constitution can limit the discretion of federal officials such that the FTCA's discretionary function exception will not apply." *Nurse v. U.S.*, 226 F.3d 996, 1002 n.2 (9th Cir. 2000). Here, the federal official's discretion is limited by the requirements of the Fourth and Fifth Amendments.

### 3. Conclusion

Even if the directives in the MOU were not mandatory, the Federal Defendants have not shown that the manner in which they executed the attempted arrest was the sort of "sort of generalized social, economic and political policy choices that Congress intended to exempt from tort liability." *Garcia* at 809. The United States' motion to dismiss Plaintiffs state law claims against it pursuant to the discretionary function exception to the FTCA (Dkt. 163) should be denied.

### B. QUALIFIED IMMUNITY AGAINST NEGLIGENCE AND OUTRAGE CLAIMS UNDER ALASKA STATE LAW

The United States argues that the deputy marshals are shielded by qualified immunity under Alaska law. Dkt. 163. Plaintiffs argue that under *U.S. v. Olson*, 546 U.S. 43 (2005), the deputy marshals are not entitled to raise the Alaska qualified immunity defenses afforded to Alaska law officers in certain circumstances. In *Olson*, the U.S. Supreme Court held that liability under the FTCA is to be based on the state law liability of a private party, not of a state or municipal entity. The Ninth Circuit has recently held that *Olson* required examination of the state law regarding the liability of a private person in similar circumstances. *Tekle v. U.S.*, 511 F.3d 839, 854 (9th Cir. 2007). In that case, the Ninth Circuit held that federal law enforcement agents actions were to be examined from the perspective of a private parties' liability for false arrest, assault and battery, and intentional infliction of emotional distress. *Id.* The Homer Defendants make no showing that under Alaska law, qualified immunity could be afforded to private party making an arrests which was alleged to have been excessive. Even if a private party could possibly be afforded Alaska's qualified immunity for an arrest where excessive force

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 41

was used, there are issues of fact precluding summary judgment for the deputy marshals here.

As above, Alaska applies a standard similar to the federal standard when considering qualified immunity in excessive force cases. *Estate of Logusak ex rel. Logusak v. City of Togiak*, 185 P.3d 103, 110 (Alaska 2008) (citing *Sheldon v. City of Ambler*, 178 P.3d 459, (Alaska 2008)). That is: 1) Were the officers' actions objective reasonable? 2) Could the officers have reasonably believed that their actions were reasonable? *Sheldon,* at 463.

### 1. Objectively Reasonable?

The deputy marshals acknowledge that the standard is the same under Alaska law and Federal law. They argue that they are entitled to qualified immunity under the Federal law, and incorporate their prior arguments - that the arrest plan was objectively reasonable. Dkt. 163, at 17.

As stated above, there are issues of fact as to whether the Federal Defendants' decision to effect the arrest outside the terminal was, in the circumstances, objectively reasonable.

### 2. Reasonable Objective Belief?

Further, as in the Homer officers' case, there are issues of fact as to whether the deputy marshals could have reasonably believed that participation in the plan to arrest Anderson outside was reasonable. The analysis on the Homer officer's claims to state law qualified immunity applies here. Further, there is stronger evidence that both deputy marshals, particularly Olson, knew that the children were in the car. The deputy marshals discussed various options when Anderson refused to come into the terminal. Under these circumstances, there are issues of fact as to whether the deputy marshals could have reasonably believed that forcing the arrest of Anderson outside the terminal was reasonable. The motion to dismiss the state law claims based on Alaska state qualified immunity should be denied without prejudice.

### C. D.A.'s Claims for Negligence and Outrage

The United States moves for dismissal of D.A.'s claims of negligence and outrage based on her failure to demonstrate an emotional injury. Dkt. 163. As stated in the analysis of the Homer Defendants' motion, D.A. has failed to show that she was "shocked" by observing any of these events.

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 42

Her claims for negligence and outrage should be dismissed.

### D.    J.A.'s Claim for Outrage

The United States move for dismissal of J.A.'s claim for outrage.  Dkt. 163.  The government

argues that:

> There is no evidence that Plaintiff J.A., II, a 2-year old, perceived or understood the
> Deputy Marshals' conduct in attempting to arrest Anderson, or Anderson's refusal to
> surrender and pointing of his gun, or the resulting shooting incident with the officers. It is
> undisputed that Plaintiff J.A., II's gunshot wound resulted in severe and permanent brain
> trauma and cognitive impairment. Thus, Plaintiffs will not be able to prove that Plaintiff
> J.A. II experienced any severe emotional distress as a result of or attributable to his
> "witnessing" the Deputy Marshals' alleged conduct.

Dkt. 163, at 23.

The government fails to cite any authority for this proposition.  J.A. was two at the time of the

events.  He was found crying after the gun fire ended.  Why he was crying is a question for the trier of

fact.  His claim for outrage should not be dismissed on summary judgment.

### E.    Ms. Dietzman's Claim for Outrage

The Alaska Supreme Court adopted the Restatement (Second) of Torts § 46 regarding the state

claim for outrage.  *Lybrand v. Trask*, 31 P.3d 801, 803, n.4 (Alaska 2001).  The Restatement 2d of Torts

§ 46 states:

> (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe
> emotional distress to another is subject to liability for such emotional distress, and if
> bodily harm to the other results from it, for such bodily harm.
> (2) Where such conduct is directed at a third person, the actor is subject to liability if he
> intentionally or recklessly causes severe emotional distress (a) to a member of such
> person's immediate family who is present at the time, whether or not such distress results
> in bodily harm, or (b) to any other person who is present at the time, if such distress
> results in bodily harm.

The United States moves for dismissal of Ms. Dietzmann's outrage claim, arguing that under the

Restatement of Torts, Ms. Dietzmann needed to be physically present and witness the allegedly

outrageous conduct to recover under a theory of outrage.  Dkts. 163 and 200.

It is undisputed that Ms. Dietzmann was not present at the airport.  She was not present at the

first hospital J.A. was taken to in Homer, Alaska.  She was told he had a "grazing injury."  J.A. was

transferred to a hospital in Anchorage.  Ms. Dietzmann flew ahead and was waiting for him at the

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 43

Anchorage hospital. It was not until fifteen minutes before she saw him that she became aware of the extent of his injuries.

Ms. Dietzmann argues that holding in *Tommy's Elbow Room, Inc. v. Kavorkian*, 727 P.2d 1038 (1986), applies. Dkt. 180. In *Kavorkian*, the Alaska Supreme Court relaxed the contemporary observance requirement in cases alleging the negligent infliction of emotional distress. The court there held that there "is not a rigid requirement of sensory and contemporaneous observance of the accident," but "rather is the reasonable foreseeability that the plaintiff-witness would suffer emotional harm." *Id*. The court found in that case that the plaintiff, who was the victim's father, "was aware of the occurrence of an accident, he arrived home and, finding that his daughter was not there, immediately realized that she must have been involved in the accident." *Id*. When he got to the scene, "he perceived and suffered shock from observing his child's injury." *Id*. The Court held that it could not say as "a matter of law that it was not reasonably foreseeable that he would appear at the scene of the accident." *Id*. The Court held that the father had not articulated sufficiently "outrageous" conduct to sustain an outrage claim. *Id.*, at 1043. The Court explicitly did not "reach the issue of whether [the father in that case] is precluded from claiming intentional infliction of emotional distress because he was not 'present at the time' of the defendant's allegedly tortious conduct." *Id.,* at 1043, n.7.

Parties have not cited Alaska law on whether the contemporary observance requirement may be relaxed for an outrage claim. As a federal court applying Alaska law, the Court must apply the law as it believes the Alaska Supreme Court would apply it. *Gravquick A/S v. Trimble Navigation Intern. Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003). The Alaska Supreme Court in *Kavorkian* has recognized that the "rigid requirement of sensory and contemporaneous observance of the accident" is not the core of the question in these types of incidents. But, rather it is the reasonable foreseeability that the plaintiff-witness would suffer emotional harm. *Id*. Although it appears that the Alaska Supreme Court would apply this reasoning regarding the contemporaneous observation requirement, Ms. Dietzmann's outrage claim fails to account for one other factor. Unlike the plaintiff in *Kavorkian*, not only did she not see the shootout, Ms. Dietzmann did not ever appear at the Homer Airport scene. The *Kavorkian*

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 44

Court held that it could not say as "a matter of law that it was not reasonably foreseeable that [the father] would appear at the scene of the accident." *Id*., at 1042. It is undisputed that she did not see the shootout, did not appear at the scene afterward, and did not see her child until hours later. Accordingly, her claim for outrage is too tenuous under Alaska law. The United States' motion to dismiss Ms. Dietzmann's outrage claim should be granted.

## F. MOTION TO DISMISS CLAIMS AGAINST U.S. MARSHAL'S SERVICE and DEPUTY MARSHALS

Plaintiffs do not contest dismissal of all claims against the U.S. Marshal's Service and the Deputy Marshals in their "official capacities."

## ORDER

Therefore, it is hereby, **ORDERED** that:

• Plaintiffs' Motion for Partial Summary Judgment (Dkt. 101) is:

    • **DENIED** as to whether Defendant's conduct constituted a Fourth Amendment seizure,

    • **GRANTED** as to whether Alaska's non-economic damages and punitive damages statutes do not limit 1983 or *Bivens* claims damages, and

    • **DEN**I**ED** as to whether Defendants' liability under 1983 and *Bivens* are jointly or severally liable,

    • **GRANTED** as to whether the damages from 1983 and *Bivens* claims, if any, are subject to Alaska's apportionment statute;

• Federal Defendants Motion for Summary Judgment that there was no Fourth Amendment seizure of the children (Dkts. 118 and 126) is **DENIED**.

• Federal Defendants Motion for Partial Summary Judgement on Plaintiffs' *Bivens* Claims for Alleged Violation of Fourth Amendment Rights (Dkt. 158) is:

    • **DENIED** as to whether Defendants' conduct constituted a Fourth Amendment seizure,

    • **DENIED** as to whether the seizure, if any, was reasonable, and

    • **DENIED WITHOUT PREJUDICE** as to the defense of qualified immunity;

• City of Homer's Cross Motion for Partial Summary Judgment on Fourth Amendment Claims

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 45

(Dkts. 107, 129, 130) is:

- **DENIED** as to whether Defendants' conduct constituted a Fourth Amendment seizure,

- **DENIED** as to whether the seizure, if any, was reasonable, and

- **DENIED WITHOUT PREJUDICE** as to the defense of qualified immunity;

- The Federal Defendants' Motion to Dismiss Cherry Dietzmann's *Bivens* Claims Against Deputy Marshals Kevin Guinn and John Olson, Jr. as Barred by Statute of Limitations (Dkt. 146) is **GRANTED**,

- Ms. Dietzmann's Substantive Due Process claim asserted against the individual deputy marshals pursuant to *Bivens* is **DISMISSED**,

- The Federal Defendants' Motion for Summary Judgment on Plaintiff's *Bivens* Claims for Alleged Violations of Fifth Amendment Rights (Dkt. 164) is **GRANTED** as to Ms. Dietzmann's claim (as above), and **DENIED WITHOUT PREJUDICE** as to qualified immunity on the children's Substantive Due Process claims;

- City of Homer's Motion for Summary Judgment - Remaining Federal Claims (Dkt. 159) is:

  - **DENIED WITHOUT PREJUDICE** as to qualified immunity on Plaintiffs' Substantive Due Process claims asserted against the individual defendants pursuant to § 1983;

  - **GRANTED** as to Plaintiffs' claims against the City of Homer or the Homer Police Department asserted under § 1983;

    - Plaintiffs § 1983 claims against the City of Homer and Homer Police Department **ARE DISMISSED**;

  - **GRANTED** as to Plaintiffs' claims against the Homer Defendants pursuant to § 1983 for violations of the Alaska Constitution;

    - Plaintiffs' claims against the Homer Defendants pursuant to § 1983 for violations of the Alaska Constitution **ARE DISMISSED**;

  - **GRANTED** as to Plaintiffs' §1983 claims against Homer Chief of Police Mark Robl and Sergeant Lawrence Kuhns;

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 46

1    • Plaintiffs' §1983 claims against Homer Chief of Police Mark Robl and Sergeant

2      Lawrence Kuhns **ARE DISMISSED**.

3    • The Homer Defendants' Motion for Summary Judgment - State Claims (Dkt. 153) is:

4      • **DENIED WITHOUT PREJUDICE** as to qualified immunity on Plaintiffs' state law

5        claims as asserted against the individual defendants pursuant;

6      • **GRANTED** as to D.A.'s negligence and outrage claims;

7        • D.A.'s negligence and outrage claims **ARE DISMISSED**;

8      • **GRANTED** as to Ms. Dietzmann's outrage claim;

9        • Ms. Dietzmann's outrage claim **IS DISMISSED;**

10     • **DENIED** as to J.A.'s outrage claim;

11     • **GRANTED** as to any punitive damages claims asserted against the City of Homer or

12       Homer Police Department;

13     • **DENIED** as to punitive damages asserted against the individual Homer Defendants;

14     • **GRANTED** as to Plaintiffs' state law claims against Homer Chief of Police Mark Robl

15       and Sergeant Lawrence Kuhns;

16       • Plaintiffs' state law claims against Homer Chief of Police Mark Robl and

17         Sergeant Lawrence Kuhns **ARE DISMISSED**.

18   • The United States' Motion for Dismissal, Judgment on the Pleadings, or Summary Judgment

19     with Respect to Plaintiffs' FTCA Claims and Any Claims Asserted Against the U.S. Marshals

20     Service or Against Deputy Marshals Olson and Guinn in their Official Capacity (Dkt. 163) is:

21     • **DENIED** as to the motion to dismiss the state law claims as barred by the discretionary

22       function exception to the FTCA;

23     • **DENIED WITHOUT PREJUDICE** as to Alaska's qualified immunity on Plaintiffs'

24       state law claims as asserted against the United States;

25     • **GRANTED** as to D.A.'s negligence and outrage claims;

26       • D.A.'s negligence and outrage claims **ARE DISMISSED**;

27

28   Order on the Parties' Motions for Summary Judgment and Various Other Motions - 47

1    •    **DENIED** as to J.A.'s outrage claim;

2    •    **GRANTED** as to Ms. Dietzmann's outrage claim;

3         •    Ms. Dietzmann's outrage claim **IS DISMISSED**;

4    •    **GRANTED** as to Plaintiffs' FTCA claims to the extent that they are asserted against the

5         U.S. Marshals Service and United States Deputy Marshals Guinn and Olson in their

6         "official capacities;"

7         •    Plaintiffs' FTCA claims, to the extent that they are asserted against the U.S.

8              Marshals Service and United States Deputy Marshals Guinn and Olson in their

9              "official capacities," **ARE DISMISSED**.

10   The effect of the foregoing Order is that this matter shall proceed with the following claims:

11   •    J.A. and D.A.'s claim for violation of their right against unreasonable seizures pursuant to the

12        Fourth Amendment against Deputy Marshal Olson, Deputy Marshal Guinn, Sergeant Hutt,

13        Sergeant Shealy, and Officer Luck;

14   •    J.A. and D.A.'s alternative claim for violation of their Substantive Due Process Rights under the

15        Fifth and Fourteenth Amendment against Deputy Marshal Olson, Deputy Marshal Guinn,

16        Sergeant Hutt, Sergeant Shealy, and Officer Luck;

17   •    Ms. Dietzmann's claim for violation of her Substantive Due Process Rights under the Fourteenth

18        Amendment against Sergeant Hutt, Sergeant Shealy, and Officer Luck;

19   •    J.A.'s claims for outrage against the United States pursuant to the FTCA;

20   •    J.A. and Ms. Dietzmann's claims for negligence against the Untied States pursuant to the FTCA;

21   •    J.A.'s claim for outrage against the City of Homer, Sergeant Hutt, Sergeant Shealy, and Officer

22        Luck;

23   •    J.A. and Ms. Dietzmann's claim for negligence against the City of Homer, Sergeant Hutt,

24        Sergeant Shealy, and Officer Luck.

25

26   **IT IS SO ORDERED**.

27

28   Order on the Parties' Motions for Summary Judgment and Various Other Motions - 48

The Clerk of the Court is instructed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

DATED this 17th day of November, 2010.

Robert J. Bryan
United States District Judge

Order on the Parties' Motions for Summary Judgment and Various Other Motions - 49